IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:15-CV-39-D

ROBERT HOWARD,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        **ORDER**
                                        )
COLLEGE OF THE ALBEMARLE,               )
and KANDI DEITEMEYER,                   )
                                        )
                    Defendants.         )

On July 29, 2016, College of the Albemarle and Kandi Deitemeyer ("defendants") moved

for summary judgment [D.E. 38] in this employment-discrimination action and filed a memorandum

in support [D.E. 41]. On September 28, 2016, Robert Howard, ("Howard" or "plaintiff"), who

proceeds pro se, responded in opposition [D.E. 58]. On October 17, 2016, defendants replied [D.E.

68]. As explained below, the court grants defendants' motion for summary judgment.

I.

On May 1, 2013, College of the Albemarle ("COA") hired Howard as the Vice President of

Business and Administrative Services. See [D.E. 43] ¶ 1; [D.E. 59] ¶ 1; Compl. [D.E. 5-1] ¶ 7; Ans.

[D.E. 6] ¶ 7. On April 5, 2013, Howard signed a 60-day contract. See [D.E. 68-4]. Under the

contract, Howard was "to perform services as Vice President of Business and Administrative

Services . . . commencing on the 1st day of May 2013, and continuing through the 30th day of June

2013." Id.

COA's President, Kandi Deitemeyer ("Deitemeyer"), made the decision to hire Howard.

Deitemeyer Aff. [D.E. 61-1] ¶ 13. When Deitemeyer decided to hire Howard, Deitemeyer knew that

Howard was a male, over age 40, and older than her; however, neither Howard's gender nor his age had anything to do with Deitemeyer's decision to hire Howard. See id. As COA President, Deitemeyer does not have to obtain permission from the Board of Trustees to hire, discipline, or terminate employees. [D.E. 17-2] ¶ 21; see [D.E. 43] ¶ 4; [D.E. 59] ¶ 4. The COA personnel policy states that all employees, when not employed under a contract, may be terminated at will. [D.E. 17-2] ¶ 21; see [D.E. 43] ¶ 5; [D.E. 59] ¶ 5.

Howard's initial contract expired on June 30, 2013, after which he continued as an at-will employee. [D.E. 68-4]; see [D.E. 43] ¶ 6; [D.E. 59] ¶ 6.

In September 2013, Deitemeyer evaluated Howard's performance by writing her own evaluation, obtaining an evaluation from Howard's colleagues, and obtaining Howard's own self-evaluation. See Deitemeyer Aff. ¶ 8; [D.E. 17-11]; [D.E. 43] ¶ 7; [D.E. 59] ¶ 7. The evaluation Howard's colleagues provided to Deitemeyer included the following comments:

- "I think he is trying but seems overwhelmed . . . ."
- "[D]oes not come prepared to the meetings - does not have material with him."
- "[W]as concerned with his response concerning his area. (In the heat of the moment, told me 'no one was going to tell me how to organize/staff his area' - his tone really surprised me. I also received a telephone call concerning Bob's unprofessional conduct. I have had several staff members share concerns with me - ex.: forgetful, delegates 'his' work to other staff members . . . . I have concerns about his overall performance . . . . "
- "Lacks in organization of office and often cannot find or misplaces documents of importance. Seems to have difficulty recalling conversations, e-mails, etc. regarding work related situations and has to be reminded constantly of history of situations."
- "Forgetful. Not organized. Has not gotten any concept of how things are run at COA. Does not have any comprehension as to his duties."
- "I personally feel Mr. Howard does not respect the employees under him. He does not value their history or knowledge . . . . It appears he has severe problems with his memory . . . . He doesn't remember whole conversations . . . . You can't trust that he has done what he said he would . . . ."
- "He does delegate items, but often it is ineffective and he doesn't seem to be aware of the additional stress his delegation causes his staff . . . . Bob has had difficulty learning and managing the many hats of his position."

2

[D.E. 17-12] 4–5. Deitemeyer's own written evaluation reflected some of the same concerns as Howard's colleagues, as well as her own concerns. See [D.E. 17-11]. Deitemeyer found "that [Howard] is much more comfortable in the 'big picture' and abstract than with concrete, and detail oriented nuances of the business office operations." Id. at 1. Deitemeyer also noted that "[i]n his first 90+ days at COA, I anticipated much deeper and cognizant outcomes to the body of work he inherited; however his approach to his role has been sporadic, confused and at times disorganized." Id. Deitemeyer also found that "[Howard] is struggling in his new role at COA. He is well liked, but overall there is not a momentum of confidence for him in this role. His style of leadership has been very different and somewhat difficult for his division." Id. at 3. Deitemeyer also noted that she had "concerns about [Howard's] ability to thrive in the role long term" and that she planned to "monitor his performance and fit with COA for the next several months. In short, my confidence and that of his team should be much higher given the work experience he brought to the college and this role." Id. at 6.

On August 7, 2013, Howard completed a self-evaluation form. [D.E. 17-13]; see [D.E. 43] ¶¶ 7, 12; [D.E. 59] ¶¶ 7, 12. The form asked employees to rate themselves on a scale of 1 to 5 in 26 categories, and also asked open-ended questions. Howard gave himself 4's and 5's in each category and did not answer the open-ended questions. [D.E. 17-13].

On an unspecified date, Deitemeyer told Howard she was concerned about his performance. Deitemeyer Aff. ¶ 9. Deitemeyer explained that Howard was not able to provide her with the "informed recommendations, reliable data, and confident financial and cost analysis" Deitemeyer needed as President and that Howard was more concerned about abstract issues. Id.; [D.E. 43] ¶ 23; [D.E. 59] ¶ 23. During the meeting, Deitemeyer tried to make clear to Howard that he "had not built sufficient confidence and trust" with his team or with her and that his performance had to improve

3

"very quickly." Deitemeyer Aff. ¶ 9. Deitemeyer believed that Howard lacked "a sufficient understanding, knowledge or focus on the details of his job," but she did not believe these issues related to a memory problem or any type of disability. Id. Nonetheless, during the meeting Howard said he would have his memory tested. Id. Deitemeyer did not ask Howard to get his memory tested and "did not care about whether he had any type of test performed." Id.

On September 11, 2013, Deitemeyer offered Howard a contract to continue his employment on a probationary basis through October 31, 2013. [D.E. 68-5]. On October 16, 2013, Howard signed the contract. Id. Other than the dates of employment and execution, Howard's May 2013 contract and the October 2013 probationary contract contained identical provisions, including the following:

> All new staff appointments to positions and services of the institution are for a probationary period of nine (9) working months. An employee may be dismissed at anytime during the probationary period without notice or cause if it is felt that the employee is not capable of carrying out his/her assigned duties and responsibilities.
> . . .
>
> It is clearly understood, agreed, and acknowledged by the EMPLOYEE that the term of employment hereunder shall not extend beyond the term of employment hereinabove set forth, and there is no expectancy of employment or re-employment beyond the term provided in this agreement, nor has such been offered or implied. Therefore, by accepting this contract the employee acknowledges that he/she has no property interest or right to continued employment after the termination date for this contract. Although the employee may be asked to report to duty between contractual periods, such continued employment is terminable at will until the employee and President have both signed a new contract.
> . . .
>
> This contract for services supersedes any previously signed agreement, and may only be modified by an instrument of equal dignity herewith, and the interpretation of terms used herein shall be governed by the laws of the State of North Carolina.

Id.; see [D.E. 68-4].

It was unusual for Deitemeyer to issue such a brief contract extension to a member of her

leadership team, but she did so because she had serious concerns about Howard's performance. Deitemeyer Aff. ¶ 10. After Howard's probationary contract expired on October 31, 2013, Howard did not sign any new employment contract.

On November 6, 2013, Wendy Brickhouse ("Brickhouse"), COA's Human Resources Director, sent an email to Howard and Deitemeyer that read:

> Based on the discussion held late yesterday afternoon in the President's Office, I will not discuss the salary for Dennis with you unless you can treat me professionally and respect the current college policy. On several occasions, you have been disrespectful towards me and have created a hostile and offensive environment in our working relationship.

[D.E. 17-14].

On November 8, 2013, Teresea Harris ("Harris"), another COA employee, complained to Deitemeyer about Howard. See [D.E. 17-15]. Harris complained about Howard's conduct at a training session attended by herself, Howard, and several other COA employees. Id. Harris made a suggestion in the meeting about the form of a report, and in response Howard, "in front of my co-workers and our trainer, went a little ballistic about getting exactly what he wanted." Id. Harris complained that Howard's behavior "is totally unprofessional behavior in a 'Professional' employer against his subordinate employee." Id. Susan Gentry ("Gentry"), another COA employee, attended the meeting when Howard "went a little ballistic" at Harris, and Gentry corroborated Harris's account. [D.E. 38-4] 5–9.

Deitemeyer decided to terminate Howard's employment based on the above-described evaluations, complaints, and performance concerns, and Deitemeyer's determination that Howard was not demonstrating the leadership skills, abilities, or attributes necessary to perform effectively as COA's Vice President of Business and Administrative Services. See Deitemeyer Aff. ¶¶ 8, 12. On November 15, 2013, Deitemeyer and Brickhouse met with Howard to inform him of

5

Deitemeyer's decision to terminate his employment at COA. See id. ¶ 12; [D.E. 43] ¶¶ 52, 54; [D.E. 59] ¶¶ 52, 54. Deitemeyer handed Howard a termination letter, which states:

> As you are aware, you joined the college on May 1, 2013, as the Vice President of Business and Administrative Services. In accordance with College policy, you received a 90 day evaluation, which included feedback from colleagues, subordinates and myself. The evaluation showed several areas which needed attention as you moved forward in this critical role at College of The Albemarle. As an outcome, you were extended a contract only through October 31, 2013, which has since ended. Thus, your contract has expired and you are currently serving at will.

> After very careful consideration, I have decided not to continue your employment with the College. Therefore, effective immediately, the College will be moving in another direction to advance the mission of the college, as we vision toward becoming a premier community college.

> Thank you for your service to the College. I wish you the best in your future endeavors.

[D.E. 17-16] (emphasis in original). During the meeting Deitemeyer did not mention Howard's age, sex, or memory, although the letter referenced the evaluation which included COA employees' comments about Howard's memory. [D.E. 43] ¶ 56; [D.E. 59] ¶ 56.

COA has a grievance policy that allows employees (including at-will employees) to request a hearing before the Board of Trustees. See [D.E. 17-7]; [D.E. 17-2] ¶ 21. An employee may receive such a hearing if the employee submits a written request within ten days of his or her dismissal, demonstrating that "impermissible reasons" were involved in the dismissal. [D.E. 17-7] 5. The policy defines "impermissible reasons" to include various forms of discrimination, including discrimination based on sex, age, or disability. Id. at 2.

Howard never requested a hearing in accordance with COA's grievance policy. [D.E. 43] ¶ 58; [D.E. 59] ¶ 58.[1] In a letter dated November 20, 2013, Howard complained to COA's Board

---

[1] In his response to COA's statement of material facts, Howard claims that he did request a hearing, but does not cite to admissible evidence supporting this contention. See [D.E. 43] ¶ 58;

of Trustees about COA's management, operations, and personnel administration and praised his own accomplishments. [D.E. 17-17]. In the letter, Howard noted that his evaluation contained "several references to [his] memory" but that he believed those were "just unkind remarks." Id. at 8. Howard also stated that Deitemeyer "[i]ndicated that I am much older than she," but did not claim that he had been fired because of his age. Id. Howard wrote that he believed the current personnel structure at COA gave too much power to the president and thereby created "a place of fear and intimidation." See id. at 11; see also [D.E. 38-3] 35.

On April 4, 2014, Howard sent another letter to the Board of Trustees. [D.E. 43] ¶ 61; [D.E. 59] ¶ 61. Again, Howard did not state in the letter that he believed that any impermissible reasons motivated his termination. [D.E. 43] ¶ 61; [D.E. 59] ¶ 61. The Board of Trustees did not hold a grievance hearing concerning Howard's second letter.

At some point after April 4, 2014, Howard filed a charge of discrimination with the EEOC. See [D.E. 38-3] 36; [D.E. 43] ¶ 62; [D.E. 59] ¶ 62. Howard alleged sex, age, and disability discrimination. See Compl. ¶ 114. On June 23, 2015, the EEOC issued a right to sue notice to Howard. [D.E. 43] ¶ 63; [D.E. 59] ¶ 63.

On September 23, 2015, Howard filed suit in Pasquotank County Superior Court. See Compl. [D.E. 5-1]. Defendants timely removed the action to this court based on federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. See [D.E. 1, 5]. Howard's complaint contains five claims: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") against COA (Compl. ¶¶ 117-30); (2) disability discrimination in violation of the Americans with Disabilities Act ("ADA") against COA (id.

---

see also Local Civ. R. 56.1(a)(3). Therefore, the assertion that Howard never requested a hearing is deemed admitted. See Local Civ. R. 56.1(a)(2)-(3).

¶¶ 131–36); (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") against COA (id. ¶¶ 137–46); (4) wrongful discharge in violation of North Carolina public policy against COA (id. ¶¶ 147–58); and (5) intentional infliction of emotional distress against Deitemeyer (id. ¶¶ 159–70).

## II.

In considering defendants' motion for summary judgment, the court views the evidence in the light most favorable to Howard and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially come forward and demonstrate an absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [factfinder] could

8

reasonably find for the [nonmoving party]." <u>Anderson</u>, 477 U.S. at 252.

A.

In count one, Howard contends that COA terminated his employment due to his sex. Howard lacks direct evidence of such disparate treatment; therefore, he relies on the burden-shifting framework in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under <u>McDonnell Douglas,</u> Howard first must establish a prima facie case of sex discrimination by showing that (1) he is a member of a protected class; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of his discharge; and (4) the discharge arose under circumstances permitting a reasonable inference of sex discrimination. <u>See, e.g.</u>, <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), <u>abrogated</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517 (2013); <u>Hughes v. Bedsole</u>, 48 F.3d 1376, 1383 (4th Cir. 1995). If Howard succeeds in proving his prima facie case, the burden shifts to COA to articulate a legitimate, nondiscriminatory reason for Howard's discharge. <u>See, e.g.</u>, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506–09 (1993); <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). If COA carries this burden of production by articulating a legitimate, nondiscriminatory reason for Howard's discharge, Howard must prove that the reason offered by COA was a mere pretext for sex discrimination. <u>See, e.g.</u>, <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000); <u>Burdine</u>, 450 U.S. at 253–56; <u>Hux v. City of Newport News</u>, 451 F.3d 311, 315 (4th Cir. 2006); <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d 510, 514 (4th Cir. 2006); <u>Hill,</u> 354 F.3d at 298; <u>King v. Rumsfeld</u>, 328 F.3d 145, 150–54 (4th Cir. 2003); <u>Wileman v. Frank</u>, 979 F.2d 30, 33 (4th Cir. 1992).

A plaintiff can prove pretext by showing that the alleged nondiscriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative

9

of [sex] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); Reeves, 530 U.S. at 147. In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on the basis of sex. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [sex]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

An employer is entitled to summary judgment on the issue of pretext if the employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148. Moreover, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for a discharge." Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999) (quotation omitted). Terminating an employee for poor performance is not sex-related, and an employer lawfully can rely on poor performance in taking adverse employment action. See Mereish, 359 F.3d at 335; Hawkins, 203 F.3d at 280; Fisher v. Asheville-Buncombe Tech. Cmty. Coll., 857 F. Supp. 465, 469–70 (W.D.N.C. 1993).

COA argues that Howard was not fulfilling COA's legitimate expectations when COA discharged him. In support, COA cites Deitemeyer's testimony and supporting documentation

detailing Deitemeyer's belief that Howard's poor performance demonstrated he lacked the leadership skills, abilities, or attributes necessary to perform effectively as COA's Vice President of Business and Administrative Services. See [D.E. 41] 15. Howard responds that his own testimony shows he was qualified and performing his job duties satisfactorily. See [D.E. 58] 2–6.

In considering whether an employee was meeting his employer's legitimate expectations, however, "it is the perception of the [employer] which is relevant, not the self-assessment of the plaintiff." Hawkins, 203 F.3d at 280 (alteration and quotation omitted); see King, 328 F.3d at 149; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). Thus, an employee's own testimony about his job performance does not create a genuine issue of material fact as to whether he was meeting his employer's legitimate expectations. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 618 F.2d at 1067; Smith v. Martin, No. 5:10-CV-248-D, 2011 WL 3703255, at *5 (E.D.N.C. Aug. 23, 2011) (unpublished); O'Daniel v. United Hospice, No. 4:09-CV-72-D, 2010 WL 3835024, at *4 (E.D.N.C. Sept. 29, 2010) (unpublished); Lloyd v. New Hanover Reg'l Med. Ctr., No. 7:06-CV-130-D, 2009 WL 890470, at *9 (E.D.N.C. Mar. 31, 2009) (unpublished); McDougal-Wilson, 427 F. Supp. 2d at 611. Likewise, to the extent Howard seeks to rely on the opinion evidence of some coworkers concerning his performance,[2] such opinion evidence does not create a genuine issue of material fact as to whether he was meeting his employer's legitimate expectations. See King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 2011 WL 3703255, at *5. Even viewing the evidence in the light most favorable to Howard, Howard has failed to establish a prima facie case of sex discrimination. Thus, the court grants summary judgment to COA on count one.

---

[2] See [D.E. 59] ¶ 8 (collecting excerpts of positive references to Howard from coworkers' deposition testimony).

Alternatively, even if Howard could establish a prima facie case of sex discrimination, his sex-discrimination claim would fail because COA has articulated a legitimate, nondiscriminatory reason for discharging Howard—his poor performance—and Howard has not offered evidence from which a rational factfinder could find that COA's proferred reason was a pretext designed to mask sex discrimination. See Warch, 435 F.3d at 514–16; Miles v. Dell, Inc., 429 F.3d 480, 488–89 & n.5 (4th Cir. 2005); Hill, 354 F.3d at 285. Notably, Howard presents no admissible evidence suggesting that COA's stated reason for discharging him was a pretext to mask sex discrimination. Likewise, COA has consistently given the same reason to explain Howard's discharge: poor performance.

In opposition, Howard again cites his own opinion about his performance and laments Deitemeyer's expectations as President and COA's alleged failure to give him enough time to adjust to his new position. See [D.E. 58] 7–13. Howard also argues that Deitemeyer's concerns were factually inaccurate and based on flawed information from Deitemeyer's subordinates. See id. at 13–15. Specifically, Howard contends that the Harris email contains inaccurate information about Howard and the Brickhouse email overstated Howard's conduct. See id.

Although Howard subjectively believes that he was performing well, an employee's perception of his own performance cannot establish a genuine issue of material fact as to whether the employee was meeting his employer's legitimate expectations. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 618 F.2d at 1067. Although Howard contests the factual accuracy of the critiques of his performance, including the Brickhouse and Harris emails, the accuracy of those critiques is irrelevant to the court's inquiry. Rather, the issue is whether Deitemeyer, the decisionmaker, believed the critiques to be true, which she did. See Holland, 487 F.3d at 215–17; Hill, 354 F.3d at 293–94; Hawkins, 203 F.3d at 280. Furthermore, this court does not sit as a super-

12

personnel board and ask whether COA (through Deitemeyer) should have excused Howard's poor performance or given him more time to improve. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005); DeJarnette v. Corning Inc., 133 F.3d 293, 299–300 (4th Cir. 1998). Additionally, the same-actor inference further undermines Howard's claim in that Deitemeyer was the decisonmaker who hired Howard and, shortly thereafter, fired Howard. See Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse employment action taken by the employer."); see also Taylor v. Va. Union Univ., 193 F.3d 219, 231 (4th Cir. 1999) (en banc), abrogated in part on other grounds by Desert Palace Inc., v. Costa, 539 U.S. 90 (2003); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996); Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 214–15 (4th Cir. 1994). Even viewing the evidence in the light most favorable to Howard, no rational jury could find that COA (through Deitemeyer) was being dishonest when she explained that COA terminated Howard's employment for poor performance and that the reason was designed to mask sex discrimination. Accordingly, Howard's sex-discrimination claim fails, and the court grants summary judgment to COA on Howard's sex-discrimination claim.

## B.

In count two, Howard alleges disability discrimination in violation of the ADA. Howard has no direct evidence of disability discrimination under the ADA and relies on the burden-shifting framework in McDonnell Douglas. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003). To establish a prima facie case for his ADA claim, Howard must "produce evidence sufficient to demonstrate that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was

fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (alterations and quotations omitted); Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004); Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001); Rocha v. Coastal Carolina Neuropsychiatric Crisis Servs., 979 F. Supp. 2d 670, 677 (E.D.N.C. 2013).[3]

COA argues that Howard has not produced evidence that he was a "qualified individual" with a disability under the ADA. See 42 U.S.C. § 12112(a). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(l). Section 12102(3), in turn, states:

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph 1(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

Under section 12102(3), which Congress added in the ADAAA, an individual bringing a "regarded as" claim need only show that an employer subjected him to an action the ADA prohibits because

___

[3] Although this order includes citations to cases applying the ADA before the ADA Amendment Act of 2008 ("ADAAA"), the court has applied the ADAAA to Howard's ADA claim. See, e.g., 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(l)(1); Olsen v. Capital Region Med. Ctr., 713 F.3d 1149, 1154 (8th Cir. 2013); Young v. United Parcel Serv., Inc., 707 F.3d 437, 443 n.7 (4th Cir. 2013).

14

of an actual or perceived impairment regardless of whether the employer perceived the impairment to limit the individual in a major life activity. See 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(l)(1); Olsen, 713 F.3d at 1154; Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321–23 (6th Cir. 2012); Harris v. Reston Hosp. Ctr., LLC, No. 1:10-cv-1431, 2012 WL 1080990, at *4–5 (E.D. Va. Mar. 26, 2012) (unpublished). Thus, a "regarded as" claim under the ADAAA is much easier to prove than a "regarded as" claim before the ADAAA. Cf. Young, 707 F.3d at 443–44 (analyzing a pre-ADAAA "regarded as" claim); Rohan, 375 F.3d at 277–78 (same); Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 471 n.5 (4th Cir. 2002) (same); Davis v. Univ. of N.C., 263 F.3d 95, 99–100 (4th Cir. 2001) (same); Rhoads, 257 F.3d at 390–91 (same); Haulbrook, 252 F.3d at 703 (same).

Howard contends that COA regarded him as having an impairment related to his memory and fired him because it mistakenly believed that he had an impairment concerning his memory. See Compl. ¶¶ 132–34. In support, Howard cites the references to Howard's forgetfulness and memory in his colleagues' evaluation and the summary of that evaluation Deitemeyer provided. See [D.E. 58] 7; see also [D.E. 17-11 & 17-12] (evaluations).

Deitemeyer testified that she did not consider Howard to have a mental or physical disability, condition, or impairment—concerning his memory or anything else—even though Howard may have forgotten or failed to follow through on some of his duties. See Deitemeyer Aff. ¶ 9. Moreover, although the record does contain comments of certain colleagues who described Howard as forgetful, no evidence suggests Deitemeyer ever discussed Howard's memory with COA employees. Viewing the record in the light most favorable to Howard, no rational jury could find that COA regarded Howard as being disabled under the ADA. Thus, the court grants summary judgment to COA on Howard's ADA claim.

15

Alternatively, Howard has failed to create a genuine issue of material fact about whether he was fulfilling COA's legitimate expectations when COA terminated his employment. As discussed, he was not. Accordingly, Howard has failed to establish a prima facie case under the ADA, and the court grants summary judgment to COA on Howard's ADA claim. See Abilt v. Cent. Intelligence Agency, 848 F.3d 305, 315 n.9 (4th Cir. 2017); Rohan, 375 F.3d at 272 n.9; Rhoads, 257 F.3d at 387 n.11 (4th Cir. 2001); Haulbrook, 252 F.3d at 702; Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 61–62 (4th Cir. 1995); Rocha, 979 F. Supp. 2d at 677.

C.

In count three, Howard alleges age discrimination in violation of the ADEA. Howard has no direct evidence of age discrimination and relies on the McDonnell Douglas framework. To establish a prima facie case of age discrimination under the McDonnell Douglas framework, Howard must prove that (1) he was in the age group protected by the ADEA; (2) he was discharged; (3) at the time of his discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) after his discharge, he was replaced by someone of comparable qualifications who was substantially younger. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310–13 (1996); Ruff v. Target Stores, Inc., 226 F. App'x 294, 300–03 (4th Cir. 2007) (unpublished); Laber, 438 F.3d at 430; Wood v. Town of Warsaw, N.C., 914 F. Supp. 2d 735, 739–40 (E.D.N.C. 2012).

COA argues that Howard has failed to raise a genuine issue of material fact as to whether Howard was performing his job at a level that met COA's legitimate expectations when COA discharged him. As discussed, COA has presented substantial evidence that Howard was not performing his job at a level that met COA's legitimate expectations when COA discharged him. See Ruff, 226 F. App'x at 301–03; Diamond v. Bea Maurer, Inc., 128 F. App'x 968, 973 (4th Cir.

16

2005) (per curiam) (unpublished); Walsh v. Ciba-Geigy Corp., 121 F.3d 702, at *2 (4th Cir. 1997)

(unpublished table opinion). Therefore, Howard has failed to create a genuine issue of material fact

regarding whether he was meeting his employer's legitimate expectations at the time of his

discharge. Accordingly, Howard has failed to prove his prima facie case, and the court grants

summary judgment to COA on Howard's ADEA claim.

Alternatively, even if Howard established a prima facie case of age discrimination, Howard

has not raised a genuine issue of material fact as to whether COA's legitimate reason for his

termination (i.e., poor performance) was a pretext for age discrimination. It was not. See Laber, 438

F.3d at 430–31; Wood, 914 F. Supp. 2d at 742–44. Thus, the court grants summary judgment to

COA on Howard's ADEA claim.

### D.

In count four, Howard alleges that COA wrongfully discharged him in violation of North

Carolina public policy.[4] North Carolina law governs Howard's wrongful-discharge claim.

Accordingly, the court must predict how the Supreme Court of North Carolina would rule on any

disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.,

433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme

Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are

no governing opinions from the Supreme Court of North Carolina, the court "may consider lower

court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d

---

[4] To the extent Howard asserts this claim against Deitemeyer, the claim fails. See, e.g., Iglesias v. Wolford, 539 F. Supp. 2d 831, 840 (E.D.N.C. 2008) (supervisors are not "employers" under North Carolina law and cannot be individually liable for wrongful discharge in violation of North Carolina public policy), aff'd, 400 F. App'x 793 (4th Cir. 2010) (per curiam) (unpublished).

17

at 369 (quotation omitted).[5] In doing so, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the Supreme Court of North Carolina would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 397–98.

Under North Carolina law, an employer generally may terminate an at-will employee for any reason. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v. Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13, 17–19 (2013); Gillis v. Montgomery Cty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d

---

[5] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

447, 449–50 (2008); Whitings v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184 (2001), aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam).

The Supreme Court of North Carolina requires a plaintiff claiming wrongful discharge in violation of North Carolina public policy to allege "specific conduct by a defendant that violated a specific expression of North Carolina public policy" in a specific North Carolina statute or a specific provision in the North Carolina Constitution. Considine, 145 N.C. App. at 321–22, 551 S.E.2d at 184 ; see Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–170; Coman, 325 N.C. at 176–78, 381 S.E.2d at 447–49; Horne, 228 N.C. App. at 146, 746 S.E.2d at 17–19; Gillis, 191 N.C. App. at 379–80, 663 S.E.2d at 449–50; Whitings, 173 N.C. App. at 222, 618 S.E.2d at 753.

Howard bases his wrongful-discharge claim on allegations that Deitemeyer asked him to falsify "a personnel letter that would be a violation of Plaintiff's CPA code of ethics" and that the public policy of the State of North Carolina "as articulated in N.C. Gen. Stat. § 93-12(9), including 21 NCAC 08N, [requires] that Certified Public Accountants maintain high-ethical standards, and not falsely sign documents or bare false witness." Compl. ¶ 151, 154. Howard contends that Deitemeyer terminated him because he would not "falsify[] a disciplinary action against a college employee." Id. ¶ 155.

Count four concerns a COA employee named "Mr. D."[6] COA employed Mr. D as the Director of Campus Security and Mr. D reported to Howard. See [D.E. 17-21] ¶ 3. Mr. D applied for the position of Basic Law Enforcement Program ("BLET") Director. Id. ¶ 5. Suzanne

---

[6] To protect the employee's confidentiality rights under N.C. Gen. Stat. § 115D-29, the court refers to the employee as "Mr. D." See [D.E. 31].

Rohrbaugh ("Rohrbaugh"), COA's Vice President of Workforce Development and Continuing Education at that time, chaired a search committee for the BLET Program Director position. See id. ¶ 4. The search committee consisted mostly of volunteers from various law-enforcement agencies in COA's service area, including the Chief of Police of the City of Elizabeth City, the Sheriff of Perquimans County, and the Chief Deputy from the Dare County Sheriff's Office. See id. When the interview committee for the BLET Program Director position decided not to interview Mr. D, Mr. D became upset and filed a grievance. See id. ¶¶ 5–7. Rohrbaugh then learned that Mr. D contacted at least one member of the Search Committee to gather information about why he was not interviewed. See id. ¶ 6. Rohrbaugh consulted with Wendy Brickhouse, COA's Human Resources Director, and each was concerned that Mr. D's actions might interfere with or disrupt the search-and-selection process. See id. ¶¶ 7–8, [D.E. 17-2] ¶¶ 10–11.

On October 28, 2013, Rohrbaugh forwarded a request from COA's attorney that Howard, as Mr. D's supervisor, send Mr. D an email stating:

> It has come to my attention that you have contacted one or more of the members of the selection committee for the position of Director of Law Enforcement Programs to ask questions about the process. Apparently you have also disclosed to at least one member of the committee, who is not an employee of the College and is only a volunteer to the committee, that you are pursuing a grievance concerning the selection process. Such contacts, particularly in the context in which your questions were asked, are potentially disruptive to the process. The grievance which you filed, as was your right, is a confidential personnel matter. It will be processed under College procedure. While you have a right to pursue such a grievance, no person, including potential candidates for a position, have a right to take other actions which can be disruptive to the process. At this time, I am directing you not to contact any of the members of the selection committee regarding any matter relating to the selection process until further notice. It would be best for you to refrain from communicating with any members of the committee about other matters as well in order to avoid the appearance that you are trying to intimidate them or influence their decision. Should you take any actions which could potentially interfere with or disrupt this process, or which otherwise are intimidating towards members of the committee, you will be subject to disciplinary action.

[D.E. 17-4] 1. Howard refused. See [D.E. 17-2] ¶¶ 12–13; [D.E. 17-21] ¶¶ 11–13; [D.E. 43] ¶ 32;

[D.E. 59] ¶ 32. Howard then discussed Mr. D and the email separately with COA's attorney, but

persisted in refusing to communicate with Mr. D regarding his interference in the selection process.

See [D.E. 17-22] 2–3; [D.E. 43] ¶ 33; [D.E. 59] ¶ 33..

On October 29, 2013, Brickhouse emailed Mr. D. [D.E. 17-3]; [D.E. 17-2] ¶¶ 14–15. The

last sentence in the proposed email was removed and replaced with a paragraph reading:

> I urge you not to take any actions which could potentially interfere with or disrupt
> this process, or which otherwise are intimidating towards members of the committee.
> You should not discuss the substance of your grievance or the fact that you are
> pursuing a grievance with other employees or members of the selection committee
> because this could interfere with the investigation of your grievance. It is important
> that employee grievances be kept confidential. Interfering with or disrupting the
> selection process or the grievance investigation could lead to disciplinary action.

[D.E. 17-3]. After Mr. D received the email from Brickhouse, Mr. D. acknowledged receipt and told

Brickhouse he would not contact any other members of the search committee about the matter. See

[D.E. 17-2] ¶ 16.

Although Howard believes that the document he was asked to send to Mr. D was a "letter"

and not an "email," Howard failed to produce any document different than the emails defendants

produced. See [D.E. 17-3 & 17-4]. Howard also argues that the document had "[a] different tone,

a different message. . . . [I]t was putting him on notice. It was personnel action, as I understood it."

[D.E. 17-22] 3. Nonetheless, Howard admits that it is reasonable for an employer to ask an

employee not to disrupt a search process. See [D.E. 43] ¶ 36; [D.E. 59] ¶ 36. Howard also admits

he is not aware of any statement in the email, as presented in the document COA has placed in the

record, that was not true. See [D.E. 43] ¶ 37; [D.E. 59] ¶ 37. Howard also admits he did not receive

a copy of the letter he alleges he was asked to send and admits he has not seen anything other than

the document COA produced that looks like what he recalls being asked to send to Mr. D. See [D.E.

21

43] ¶ 38; [D.E. 59] ¶ 38. Moreover, Howard cannot recall any specific statement about the document he was asked to send to Mr. D. Howard testified that the events were "too far back for me to say specific statements were in or not in. They may have been. A lot of this may have been, but I believe there was more. I think it was different. The major difference is it's going from Wendy to [Mr. D]." [D.E. 17-22] 4–5.

Deitemeyer knew that Howard refused to send the email to Mr. D. [D.E. 17-2] ¶¶ 13, 18. Deitemeyer did not force Howard to send the email. See id. ¶ 14. Moreover, Deitemeyer does not recall Howard contemporaneously raising any ethical objection. [D.E. 43] ¶ 40; [D.E. 59] ¶ 40.

Howard's wrongful-discharge claim fails for at least two reasons. First, this court predicts that the Supreme Court of North Carolina would not conclude that the CPA Code of Ethics, N.C. Gen. Stat. § 93-12(9),[7] or 21 NCAC 8N[8] specifically express North Carolina public policy with

---

[7] N.C. Gen. Stat. § 93-12(9) states:

Adoption of Rules of Professional Conduct; Disciplinary Action.--The Board shall have the power to adopt rules of professional ethics and conduct to be observed by certified public accountants in this State and persons exercising the practice privilege authorized by this Chapter. The Board shall have the power to revoke, either permanently or for a specified period, any certificate issued under the provisions of this Chapter to a certified public accountant or any practice privilege authorized by the provisions of this Chapter or to censure the holder of any such certificate or person exercising the practice privilege authorized by this Chapter. The Board also shall have the power to assess a civil penalty not to exceed one thousand dollars ($1,000) for any one or combination of the following causes:

a. Conviction of a felony under the laws of the United States or of any state of the United States.
b. Conviction of any crime, an essential element of which is dishonesty, deceit or fraud.
c. Fraud or deceit in obtaining a certificate as a certified public accountant.
d. Dishonesty, fraud or gross negligence in the public practice of accountancy.
e. Violation of any rule of professional ethics and professional conduct adopted by the Board.

22

respect to the email concerning Mr. D. See Horne, 746 S.E.2d at 17–19; Gillis, 191 N.C. App. at 379–80, 663 S.E.2d at 449–50; Whitings, 173 N.C. App. at 222–23, 618 S.E.2d at 753–54; Considine, 145 N.C. App. at 439–41, 551 S.E.2d at 183–84. Second, even if that statute or regulation does express North Carolina public policy, and even considering the record in the light most favorable to Howard, no rational jury could conclude that COA discharged Howard for refusing to send the email to Mr. D. See [D.E. 43] ¶ 41; [D.E. 59] ¶ 41. Thus, the court grants summary judgment to COA on count four.

E.

In count five, Howard alleges intentional infliction of emotional distress against Deitemeyer.

---

> Any disciplinary action taken shall be in accordance with the provisions of Chapter 150B of the General Statutes. The clear proceeds of any civil penalty assessed under this section shall be remitted to the Civil Penalty and Forfeiture Fund in accordance with G.S. 115C-457.2.

N.C. Gen. Stat. § 93-12(9).

[8] 21 NCAC 8N contains the Rules of Professional Ethics and Conduct the North Carolina Board of Certified Public Accountant Examiners has adopted. Howard does not cite a specific portion of the administrative code, but apparently relies on the general admonition that

> A CPA shall at all times maintain independence of thought and action, hold the affairs of clients in strict confidence, strive continuously to improve professional skills, observe generally accepted accounting principles and standards, promote sound and informative financial reporting, uphold the dignity and honor of the accounting profession, and maintain high standards of personal conduct.

21 NCAC 8N.0201. Howard also apparently relies on 21 NCAC 8N.0202(a), which states that

> A CPA shall not engage in deceptive conduct. "Deception" means any fraud, misrepresentations, or omissions that a CPA either knew or should have known to have a capacity to be misleading.

Id. 8N.0202(a).

To prove his claim of intentional infliction of emotional distress ("IIED" claim), Howard must prove: (1) that Deitemeyer engaged in extreme and outrageous conduct; (2) that the conduct was intended to cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress. See Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992). To be considered "extreme and outrageous," the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether conduct qualifies as "extreme and outrageous" is a question of law for the court. See, e.g., Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Under North Carolina law, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support an IIED claim. See, e.g., Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544–45 (E.D.N.C. 2008) (collecting cases); Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004); Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000); Atkins v. USF Dugan, Inc., 106 F. Supp. 2d 799, 810–11 (M.D.N.C. 1999). "[L]iability clearly does not extend to mere insults, indignities, [or] threats . . . ." Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123 (citing Restatement (Second) of Torts § 46 cmt. d (1965)). Rather, "[i]n cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, and involved sexual advances, obscene language, and inappropriate touching." Bratcher, 545 F. Supp. 2d at 545 (collecting cases); see Moody-Williams v. LipoScience, 953 F. Supp. 2d 677, 683 (E.D.N.C. 2013); see also Payne v. Whole Foods Mkt. Grp., Inc., 812 F. Supp. 2d 705, 710 (E.D.N.C. 2011), aff'd, 471 F. App'x 186 (4th Cir. 2012) (per curiam) (unpublished).

24

The record does not show, and Howard does not argue, that Deitemeyer directed any sexual harassment, threats of physical or emotional harm, physical contact, obscene language, or other similar misconduct at him, and Howard does not base his IIED claim on such conduct. See [D.E. 43] ¶ 64; [D.E. 59] ¶ 64. Rather, Howard bases his IIED claim on the same conduct that forms the basis of his other claims. See Compl. ¶¶ 160–70.[9] In his response to COA's statement of material

---

[9] In his complaint, Howard alleges:

160.   Defendant engaged in extreme and outrageous behavior toward Plaintiff.
161.   Plaintiff was often singled out for vicious, abusive, and incorrect attacks including those outlined above.
162.   Deitemeyer was particularly inappropriate and abusive surrounding her compensation including as outlined above.
163.   Deitemeyer was sometimes irrational and whimsical in Plaintiff's assignments as the logo situation above illustrates.
164.   Deitemeyer was reckless in taking Plaintiff from another job and treating him so viciously and leaving him unemployed.
165.   Deitemeyer knew that Plaintiff was principal breadwinner of family of 4 with one child in college.
166.   Deitemeyer knew that Plaintiff was passionate about the mission of the community college to the people of North Carolina and had spent a lot of effort moving into the community college system and would find this termination a crushing blow.
167.   Deitemeyer willfully isolated Plaintiff from his colleagues.
168.   Deitemeyer was not satisfied to have Plaintiff move on to another community college opportunity. Indeed she sought to destroy and end Plaintiff's career and impede his ability to support his family.
169.   The plainly foreseeable nature of the emotional distress caused to Plaintiff demonstrates Defendant's intention to cause Plaintiff severe emotional distress, or at a minimum demonstrate that Defendants acted with reckless indifference to the likelihood that such actions would cause Plaintiff severe emotional distress.
170.   The previously described actions did in fact cause Plaintiff severe emotional distress. Plaintiff's symptoms include serious mental and emotional injuries with physical manifestations. Plaintiff has been diagnosed with Anxiety Disorder and Panic Attacks by qualified medical professionals, and been forced to seek treatment and medication for these injuries.

Compl. ¶¶ 160–70.

25

facts, Howard lists numerous instances of alleged rude behavior by Deitemeyer, but does not offer any citations to the record supporting his claims. [D.E. 59] ¶¶ 64–66.

Howard has failed to raise a genuine issue of material fact concerning whether Deitemeyer engaged in extreme and outrageous conduct. As a matter of law, she did not. See, e.g., Moody-Williams, 953 F. Supp. 2d at 682–84; Payne, 812 F. Supp. 2d at 710; Bratcher, 545 F. Supp. 2d at 544–45; Sims-Campbell v. Welch, 769 S.E.2d 643, 648–49 (N.C. Ct. App. 2015); Hogan, 79 N.C. App. at 493–94, 340 S.E.2d at 122–23. Thus, the court grants summary judgment to Deitemeyer on Howard's IIED claim.

### III.

The court has reviewed the other pending motions, the responses, and the record. The court denies as moot Howard's motion to find defendants' motion for summary judgment premature under Rule 56(d) of the Federal Rules of Civil Procedure [D.E. 46]. The court grants COA's motions to seal [D.E. 73, 99] and grants Howard's motions to seal [D.E. 79, 87, 95]. The court denies Howard's motion to compel subpoena compliance and for sanctions [D.E. 83], denies Howard's motion to depose two witnesses [D.E. 84], and grants COA's motion for leave to file a brief in excess of ten pages [D.E. 89]. The court denies COA's motion to strike Howard's reply to COA's response to Howard's motion to depose two witnesses [D.E. 97].

### IV.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 38], DENIES as moot plaintiff's motion under Rule 56(d) [D.E. 46], GRANTS defendants' motions to seal [D.E. 73, 99], GRANTS plaintiff's motions to seal [D.E. 79, 87, 95], DENIES plaintiff's motion to compel and for sanctions [D.E. 83], DENIES plaintiff's motion to depose two witnesses [D.E. 84], GRANTS defendants' motion for leave to file a brief in excess of ten pages [D.E. 89], and DENIES

26

defendants' motion to strike [D.E. 97]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 27 day of March 2017.

JAMES C. DEVER III
Chief United States District Judge